**Opinion filed April 24, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00011-CR

_____

## ROGER SCOTT WILSON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 23171-B**

## O P I N I O N

A jury found Appellant, Roger Scott Wilson, guilty of aggravated kidnapping, a first-degree felony, and assessed his punishment at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a $10,000 fine. *See* TEX. PENAL CODE ANN. § 20.04(a)–(c) (West 2019). The trial court sentenced Appellant accordingly. In three issues, Appellant challenges the trial court's judgment, arguing that (1) the evidence was insufficient to support the

conviction; (2) the finding of the use of a deadly weapon is unsupported and improper; and (3) the trial court assessed excessive fees for Appellant's arrest and the issuance of subpoenas to witnesses in conjunction with Appellant's case. We modify and affirm.

*Factual and Procedural History*

A grand jury indicted Appellant for intentionally or knowingly abducting Priscilla Limon by restricting her movements without her consent, such as to interfere with her liberty, by confining her, with the intent to prevent her liberation, by secreting or holding her in a place where she was not likely to be found, with the intent to inflict bodily injury or terrorize her. *See id.* § 20.04(a)(4), (5). The indictment further alleged that Appellant used or exhibited a deadly weapon during the commission of the offense, "namely, tape, drawstring bag, and hands." *See id.* § 20.04(b). At trial, there was testimony from multiple witnesses.

A. *Witness Testimonies*

Lindsey Hoxsey testified that she is the communications manager for Abilene Police Department (APD) dispatch and custodian of the 9-1-1 records. Hoxsey explained that there were calls for service at a home on South 14th Street in Abilene on April 22 and 24, 2021, which were recorded and admitted as exhibits. On April 22, a female caller told APD dispatch that three unknown people entered her home. On April 24, the same caller stated that the "same guys that . . . came over here the first time" broke down her door and some windows.

APD Officer Matthew Stiles testified that on April 22, 2021, he was dispatched to a house on South 14th Street. Officer Stiles spoke with the caller who said there were approximately three people wearing masks. Officer Stiles checked the area but, other than the calling party, he did not locate anyone. Officer Stiles also responded to the call on April 24, 2021. However, this time Officer Stiles observed a broken window and a door that was kicked in. Again, other than the

calling party, Officer Stiles did not find anyone in the area. APD Detective Jeremiah Shaeffer, who was a patrol officer at the time, responded to the second call on South 14th as well. Detective Shaeffer opined that the door was "broken in half . . . by extreme violence."

Oscar Villarreal resided at the house on South 14th. Villarreal explained that leading up to the break-ins, he gave Limon a place to stay for a few days. However, Villarreal said that he "r[a]n her off" because "[s]he would just be staring down on [him] when [he] was asleep" and he would awaken to see her right in front of his face. After Villarreal asked her to leave, Limon insisted that he owed her money. Although Villarreal was not sure of the date, he recalled three people coming into his home through his back door wearing masks and carrying "bats and stuff."

Tracy Prater testified that she was friends with Appellant and Limon. According to Prater, she picked Limon up at a 7-Eleven in Abilene and took her to a house on Shelton Street on April 25, 2021, because a man named George Frosch had taken Limon's belongings and Appellant said he would help get them back. By phone, Appellant provided Prater directions, which she followed, until seeing Appellant standing outside waiting, at which point she dropped Limon off. Prater later "heard a couple different stories" from Appellant about Limon's disappearance, including one where "they" burned her body, though Appellant never admitted to participating.

Johnathan Garcia testified that he rented the house at 902 Shelton from his grandfather and that several people would come and go to use drugs or stay. Garcia recalled some of the individuals that stayed there in April 2021, included Blake Britner, Ashley Alaniz, and Bruce Gordon. Garcia also noted that Appellant had been over to the house a handful of times. Garcia first met Limon in late April 2021, when she went to 902 Shelton and fought with Alaniz. Although Garcia could not recall whether Appellant was present for the fight, he did recall Appellant being

3

present later in the evening. At that time, Limon was restrained to a chair with tape. Garcia later witnessed Appellant and Britner put Limon into a toolbox belonging to Frosch. Limon's feet and hands were bound, and she was resisting. Garcia saw Britner and Appellant load the toolbox into Alaniz's Chevrolet Tahoe and Britner drove away. Garcia never saw Limon again. Garcia testified that Britner directed him to dismantle the chair in which Limon had been restrained.

Sallie Bagwell, also known as Sallie Driffill, also resided at 902 Shelton in April 2021. Bagwell recalled being awakened by a fight between Alaniz and Limon but did not see Appellant present. Shortly thereafter, Bagwell overheard Britner and Limon arguing over whether Limon had disclosed to law enforcement that they were involved in the home invasion two nights prior. Bagwell then saw Britner and Appellant "going through" Limon's phone. Bagwell overheard Britner say that "they were just going to scare [Limon]." Bagwell denied that Limon was bound to the chair.

Frosch testified that he had pleaded guilty to the aggravated kidnapping of Limon. Frosch described Appellant as a friend. Frosch knew Limon because they dated and used methamphetamine together. Frosch explained that he picked Limon up from Allsups in the early morning hours of April 25, 2021, and the two spent the night together. When Frosch awoke, he discovered that Limon had stolen $40 and three grams of methamphetamine from him. Frosch later saw Limon behind a 7-Eleven but when he attempted to confront her, she dropped her backpack and bicycle and ran. Frosch put Limon's belongings into the back of his pickup.

Frosch further testified that Limon told him that Appellant and a couple other people kicked Villarreal's door in. Frosch notified Appellant that Limon told him about the home invasion. According to Frosch, Prater made Limon get into the car to take her to 902 Shelton—Prater also told Frosch that the people there wanted to speak with him. Appellant received a call from Frosch that Limon was on her way

4

to 902 Shelton to recover her backpack and bicycle. Frosch explained that Limon was already outside 902 Shelton when he arrived, and Appellant told him that Britner and Jason Cardenas wanted to speak with him. Frosch eventually went inside, where he saw Limon taped to a chair. Cardenas asked Frosch if Limon told Frosch that they committed a home invasion, to which he answered affirmatively. Before leaving, Appellant asked Frosh if his toolbox was for sale, to which Frosch responded, "Everything is for sale." Frosch traded his toolbox for drugs and left with Appellant and Sikes.

Frosch dropped Sikes off and then he and Appellant went to Frosch's house to use the drugs he just traded for. Appellant eventually requested that Frosch take him back to 902 Shelton and he complied. Frosch did not see Alaniz's Tahoe when they arrived. Four or five days later, Frosch began hearing rumors about what happened to Limon, prompting Frosch to go on a "fishing expedition" to get information from Appellant. That is when Appellant told Frosch that Limon's body was disposed of in Frosch's toolbox. Frosch stated that when he and Appellant were in jail, Appellant explained that he and Alaniz tied Limon's hands behind her back and put her in the toolbox.

Alaniz testified that she has known Appellant since she was fifteen years old and considered him her brother. In April 2021, Alaniz was romantically involved with Britner and would stay with him at 902 Shelton, which she described as a "trap house." Alaniz recalled that Limon told Appellant that Villarreal sexually assaulted her and stole from her. Appellant agreed to help Limon get her stuff back, along with Britner, Bruce Gordon, and Cardenas. Alaniz drove them to Villarreal's house and knocked on the door but nobody answered, so Appellant "kicked in the door." Villarreal fired shots and the group ran.

Alaniz next saw Limon the following day behind 7-Eleven, where Alaniz, Nicole Sikes, Britner, Cardenas, and Appellant confronted Limon about turning

5

them in for the events at Villarreal's home. Alaniz described Appellant as being "pretty upset" about Limon potentially reporting them. Later that same day, Limon arrived at 902 Shelton. Alaniz stated that she, Limon, Appellant, Britner, Frosch, Garcia, Sikes, Anthony Aguilar, and Bagwell were present. Alaniz explained that she fought Limon because Appellant wanted her to stop Limon from "running her mouth."

According to Alaniz, once the fight ended, Bagwell taped Limon to the chair. Alaniz overheard Frosch and Britner "having a conversation about how to get rid of [Limon]." Frosh and Appellant left 902 Shelton while Alaniz went to a hotel room to take a shower. A few hours later, Alaniz returned to 902 Shelton to discover a note on the den door that no one was to enter that room. Britner disclosed to Alaniz that Limon lied about her accusations against Villarreal. Frosh then dropped Appellant back off at 902 Shelton. Although Alaniz denied seeing Limon in the house after she returned, she explained that she knew Limon was still there because Britner told her so. While Alaniz was in the bedroom, she heard Limon "screaming for [Britner], telling [Britner] no." Alaniz confirmed that Appellant was in the room with Limon, Britner, Gordon, Aguilar, Garcia, and Cardenas.

Alaniz left her bedroom and saw "[Limon] in the chair with her head down," with a clear bag over her head, and her hands still taped to the chair. Limon was not moving, and Alaniz could not tell if she was breathing. Britner asked Alaniz to clean out her Tahoe but she refused so Sikes did. Britner and Gordon left in Alaniz's Tahoe while she, Appellant, and Nikki stayed back. Frosch's toolbox and Limon were also gone.

Britner testified that he was currently incarcerated after pleading guilty to the aggravated kidnapping of Limon. Britner described Appellant as a friend and acknowledged that the two used drugs together. Britner denied that Appellant was present on the day Limon was at 902 Shelton and insisted that Appellant "had

6

nothing to do with" what happened to her. Britner acknowledged speaking to law enforcement about the events but testified that he was "high that day" and that if he said Appellant was involved, "it was a lie." Britner conceded that his gang, the Aryan Brotherhood, had a policy against testifying in court. Britner recognized that a transcript of his interview showed that he told law enforcement that Appellant carried Limon in the toolbox to Alaniz's Tahoe but Britner insisted that he did not recall making the statements. Britner subsequently admitted that Appellant was present that day but that "[h]e ended up leaving before all this went down."

Dean Zupancic testified that he was a heavy equipment operator for the City of Abilene in May 2021. On May 5, 2021, Zupancic went to repair a main line at a pump station when he discovered human remains in a creek. Zupancic explained that they had received significant rainfall in the days leading up to the discovery, causing debris to build up where the body was.

Lacy Loudermilk is a captain with Texas Parks & Wildlife. On May 5, 2021, Captain Loudermilk and several other game wardens were called to the pump station to assist in recovering the body. Captain Loudermilk explained that the corpse, a woman, was tangled up in debris, which required them to use tools to free her. Captain Loudermilk estimated that the body had been there for "a few days" based on her experience recovering drowning victims.

Dr. Tasha Zemrus is the deputy chief medical examiner for the Tarrant County Medical Examiner's Office, which assisted Taylor County with autopsies in 2021. The Medical Examiner's Office identified the body as Limon through her fingerprints.[1] According to the autopsy report, Limon's body arrived mostly unclothed with "two t-shirts that were up over her head." Additionally, "there was a cloth bag that had a drawstring on it that was over her head that was secured with

_____

[1]Appellant was neither charged with nor tried for Limon's death.

7

clear tape around the bag," "a camouflage gaiter that was also around [her] head that was secured by tape," more tape around the lower part of her face, and an orange rag partially in her mouth. Limon's hands were bound behind her back with black tape. The medical examiner determined that Limon died from asphyxiation, which could have been from the items on her head; however, it was also possible that Limon drowned.

Dylan Mueller testified that he had been in jail with Aguilar when Aguilar confessed to suffocating Limon with Britner. However, Mueller acknowledged that Aguilar's statement to him only related to Limon's death and nothing else.

APD Detective Jeff Cowan testified that Britner did not appear "high" or intoxicated during his interview. Reading from the interview transcript, Detective Cowan stated that Britner told him that Appellant put a handkerchief or gaiter in Limon's mouth, "bark[ed] out orders," and taped her to the chair. On cross-examination, Detective Cowan confirmed that no fingerprints or DNA linked Appellant to the crime. Detective Cowan opined that the drawstring bag, gaiter, and tape on Limon's head were used as a deadly weapon.

B. *Appellant's Three Interviews*

During the course of the investigation, Appellant participated in three interviews, which were recorded and admitted as exhibits and played for the jury. During the first interview, which was taken on May 14, 2021, Appellant told Detective Cowan that he last interacted with Limon approximately one week prior, when she stayed with Appellant and his girlfriend. Appellant explained that Limon "started acting really strange" and argued with his girlfriend over Limon stealing their belongings. According to Appellant, he asked Limon to leave because of the theft, and he did not see her again. Detective Cowan told Appellant that he had information that Appellant was present during Limon's last days, causing Appellant to become agitated.

8

In Appellant's second interview, taken on June 16, 2021, he disclosed that "[he] knew everything that happened from start to finish" with Limon. Appellant told detectives that Limon told him that Villarreal assaulted and stole from her, so Appellant offered to help her. Appellant "tried" to help Limon get her stuff back from Villarreal but Villarreal shot at him. At one point, Appellant admitted to being at 902 Shelton "that evening," but later said that "[he] didn't go to Shelton that night." Appellant told detectives that Gordon, Britner, and Alaniz killed Limon, but later wavered and said he did not "know for a fact" who killed Limon. Appellant became agitated, yelled at detectives, and terminated the interview.

When the detectives prepared to arrest Appellant and transport him to the jail, Appellant explained that he wanted to continue the interview. Appellant stated that he did not know Limon was at 902 Shelton, when Frosch's toolbox was unloaded, until they went inside. Appellant acknowledged that he was at 902 Shelton when Alaniz and Limon fought but he did not see it. However, Appellant subsequently acknowledged that he told Alaniz to "shut [Limon's] f-----g mouth," but he denied that he told Alaniz to "whoop" Limon. He then said that he told the women present at 902 Shelton to "check" Limon. According to Appellant, he looked around the corner after the fight to see Alaniz helping Limon up. Appellant told detectives that he helped move Frosch's toolbox onto the porch but that was it. Appellant reported that Britner later told him they saw something in Limon's phone about the alleged home invasion, but Britner would not explain what.

In Appellant's third interview, he denied that there was a home invasion at Villarreal's. However, Appellant stated that he only went the first night and that the second night others had gone. Appellant explained that he went to 902 Shelton because Frosch told him that the people there wanted to speak with Frosch about what Limon told him. Appellant went to 902 Shelton to help Frosch—shortly thereafter, Prater dropped Limon off at the house at Limon's request. Appellant told

9

detectives that when he walked inside, Britner and Alaniz were questioning Limon when Alaniz suddenly "jump[ed] on" Limon. Appellant stated that he pulled Alaniz off of Limon. Appellant later thought he saw Limon taped to the chair but was not sure. Frosch, Appellant, and Sikes were leaving when Britner asked Frosch if he wanted to sell his toolbox. This time, Appellant denied moving the toolbox. Appellant also denied that he said anything to Alaniz about "women taking care of women" before the fight, but instead said it after the fight had begun to stop the men from jumping in. Appellant also explained that he only went to Villarreal's the first night and did so alone—others went the second night. Appellant said that when he went back to 902 Shelton after leaving with Frosch, he only retrieved his bicycle and left; he did not go inside. Appellant said he first learned of Limon's death when Britner, Gordon, and Alaniz showed up at his apartment at 3:00 a.m. and informed him of it.

C. *Appellant's Testimony*

At trial, Appellant's testimony was substantially the same as his third interview, except that he testified that Britner had asked Appellant to bring Frosch over. Appellant also acknowledged that he gave Prater directions on how to get to 902 Shelton. In contrast to his previous statements, Appellant said that Frosch left before Limon arrived but returned a few minutes after she did. Appellant also testified that he helped Alaniz and Limon up after their fight. Appellant acknowledged writing two letters to Alaniz while they were awaiting trial. In both letters, Appellant wrote to Alaniz that she could not have participated in the later events because the two of them were together all night.

*The Evidence Was Sufficient to Support Appellant's Conviction*

In Appellant's first issue, he argues that the evidence was insufficient to support his conviction for aggravated kidnapping. Specifically, Appellant contends

that the evidence merely supports his presence at the scene of the crime, not his active involvement or encouragement.

A. *Standard of Review & Applicable Law*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). In reviewing the sufficiency of the evidence to support a conviction, we must "consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found that the State has proven the essential elements of the crime beyond a reasonable doubt." *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024) (citing *Jackson*, 443 U.S. at 319). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) (quoting *Jackson*, 443 U.S. at 319). Therefore, if the record supports conflicting inferences, the reviewing court must "presume that the factfinder resolved the conflicts in favor of the prosecution" and defer to the factfinder's factual determinations. *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023) (quoting *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012)). "[A] reviewing court does not sit as a thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence." *Id.* (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)); *see* TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007).

Under this standard, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted, and we treat direct and

11

circumstantial evidence equally. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Starks v. State*, 684 S.W.3d 868, 873 (Tex. App.—Eastland 2024, no pet.). In this regard, it is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland, no pet.). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, we may not use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). We consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). But "juries trump both trial and appellate judges on weight-of-evidence determinations." *Evans v. State*, 202 S.W.3d 158, 164 (Tex. Crim. App. 2006) (citing *Jackson*, 443 U.S. at 326).

We measure the sufficiency of the evidence by comparing the evidence produced at trial against "the [essential] elements of the offense as defined by the hypothetically correct jury charge." *Turley v. State*, 691 S.W.3d 612, 617 (Tex. Crim. App. 2024); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Turley*, 691 S.W.3d at 617 (citing *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019)). "The

law authorized by the indictment consists of the statutory elements of the offense as modified by the indictment allegations." *Baltimore*, 689 S.W.3d at 341.

As relevant here, a person commits aggravated kidnapping "if he intentionally or knowingly abducts another person with the intent to . . . inflict bodily injury on" or "terrorize" the person, or if he "intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense." PENAL § 20.04(a)(4), (5), (b). To "[a]bduct" a person "means to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2). "'Restrain' means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). Restraint is "without consent" if "accomplished by force, intimidation, or deception." *Id.* § 20.01(1)(A); *see Holmes v. State*, 873 S.W.2d 123, 126 (Tex. App.—Fort Worth 1994, no pet.) (explaining that "[c]onfining is not defined in the Penal Code or by case law; thus, we use its common meaning when reviewing the evidence," which may include imprisoning, enclosing, detaining, relegating to certain limits, or trapping the victim).

A "[d]eadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17)(B). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

To convict a defendant under the law of parties, the jury had to determine that the defendant was criminally responsible for the acts of another. PENAL § 7.01(a) (West 2021). "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is

criminally responsible, or by both." *Id.* Section 7.02(a)(2) of the Texas Penal Code provides that a "person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). Generally, the trial court may instruct the jury on the law of parties if "there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999). The trial court may consider the events that took place before, during, and after the commission of the crime. *See Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *Goff v. State*, 931 S.W.2d 537, 545 (Tex. Crim. App. 1996). Additionally, allegations that a party is guilty under the law of parties need not be specifically pled in the indictment. *Barrera v. State*, 321 S.W.3d 137, 144 n.1 (Tex. App.—San Antonio 2010, pet. ref'd).

B. *Analysis*

Appellant argues that the evidence was legally insufficient to convict him of aggravated kidnapping either individually or through the law of parties. As a primary actor, Appellant contends that the only evidence of criminal activity was various witnesses testifying that Appellant placed Limon in the toolbox. Appellant posits that Limon was already deceased at that time and kidnapping requires a live person. As for being a party to aggravated kidnapping, Appellant argues that the evidence only showed his mere presence at the crime scene, not active promotion, encouragement, or assistance in the aggravated kidnapping. It is important to note that Appellant does not contest whether Limon was kidnapped or whether the kidnapping was aggravated—Appellant only contests his involvement in it.

Appellant fails to consider important evidence and testimony that supports his conviction for aggravated kidnapping either as a primary actor or as a party. *See* PENAL § 20.04(a)(4), (5), (b); *Jackson*, 443 U.S. at 319. For example, Prater testified

that she took Limon to 902 Shelton at Appellant's direction. Frosch provided similar testimony and, although Appellant's own explanation varied throughout the investigation, he corroborated Prater's testimony at trial. Alaniz testified that she fought Limon at Appellant's behest. And Appellant at times provided corroborating statements regarding such behest, although he denied that his intent was for Alaniz to fight Limon. Additionally, as Appellant acknowledges, several witnesses testified to seeing him and another person place Limon into the toolbox or the toolbox into Alaniz's Tahoe. Although Appellant insists Limon was deceased when she was placed into the toolbox—and by extension, the toolbox into the Tahoe—there was no evidence directly stating such. Although Alaniz testified that Limon was tied to the chair and not moving before being placed into the toolbox, Alaniz never testified that Limon was dead. Moreover, Garcia testified that Limon was conscious and resisting as she was being placed into the toolbox. Several witnesses testified that Limon was bound to the chair and that her hands and feet were bound when she was placed in the toolbox. *See* PENAL § 20.01(1), (2) (defining "restrain" and "abduct").

It was up to the jury to resolve any conflicts in the evidence, such as whether Limon was alive when she was placed into the toolbox and by whom. *See Jackson*, 443 U.S. at 326; *see also Garcia*, 667 S.W.3d at 762. Similarly, the jury was able to judge Appellant's intent to kidnap Limon from his actions, such as directing Prater to bring Limon to 902 Shelton. *See Laster v. State*, 275 S.W.3d 512, 524 (Tex. Crim. App. 2009) ("[O]ne's acts are generally reliable circumstantial evidence of one's intent." (quoting *Rodriguez v. State*, 646 S.W.2d 524, 527 (Tex. App.—Houston [1st Dist.] 1982, no pet.))). In determining his guilt, the jury also could have considered Appellant's potential motive: stopping Limon from talking about the alleged home invasion or punishment for her already having done so. *See Nisbett v. State*, 552 S.W.3d 244, 265 (Tex. Crim. App. 2018) ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt."); *Garcia*,

667 S.W.3d at 761 (permitting jurors to draw reasonable inferences from the evidence). Finally, to support the aggravating factors for kidnapping, the jury could have considered Bagwell's testimony that the group's actions were intended to scare Limon, the fact that Limon was moved from the location and her sequential demise following those intended acts. *See* PENAL § 20.04(a)(4), (5), (b); *Garcia*, 667 S.W.3d at 761. Accordingly, we conclude that there is sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Appellant committed aggravated kidnapping against Limon as either a primary actor or a party. Appellant's first issue is overruled.

*Deadly Weapon Finding*

In his second issue, Appellant challenges the inclusion of a deadly weapon finding in the judgment, arguing that the jury did not make an affirmative finding as to such and that it cannot be inferred from the verdict. The State agrees with Appellant.

A. *Standard of Review & Applicable Law*

As we have said, a "deadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." PENAL 1.07(a)(17). A deadly weapon finding is reviewed by viewing all the evidence in the light most favorable to the verdict and determining whether any rational trier of fact could have found beyond a reasonable doubt that the object used or exhibited constituted a deadly weapon. *Brister v. State*, 449 S.W.3d 490, 493 (Tex. Crim. App. 2014). "In order to sustain a deadly-weapon finding, the evidence must demonstrate that: 1) the object meets the definition of a deadly weapon; 2) the deadly weapon was used or exhibited during the transaction on which the felony conviction was based; and 3) other people were put in actual danger." *Id.* at 494. Generally, a deadly weapon finding must be expressly and affirmatively made by the trier of fact. *Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016).

There are three ways a court can determine if the trier of fact made an affirmative deadly weapon finding: (1) the indictment alleged the use of a deadly weapon and the defendant was found guilty "as charged in the indictment"; (2) the indictment alleged use of a per se deadly weapon (e.g., a firearm); or (3) the jury made an express finding of fact pursuant to a special issue during the punishment phase of trial.[2] *Id.* (citing *Polk v. State*, 693 S.W.2d 391, 396 (Tex. Crim. App. 1985)). However, it is insufficient that the jury's verdict implies the use of a deadly weapon. *Lafleur v. State*, 106 S.W.3d 91, 95 (Tex. Crim. App. 2003). Instead, the use of a deadly weapon must be a necessary component of the offense as charged. *Roots v. State*, 419 S.W.3d 719, 724 (Tex. App.—Fort Worth 2013, pet. ref'd) (citing *Polk*, 693 S.W.2d at 394). In some scenarios, the trial court may make necessary inferences to conclude that the jury affirmatively found the use of a deadly weapon, such as where the crime alleged could only have been committed with a deadly weapon. *Id.* at 746–47 (noting a distinction between an "express" finding and an "affirmative" one).

B. *Analysis*

Appellant correctly points out that while the grand jury's indictment alleges the use of a deadly weapon, that is not the sole factor that could support aggravated kidnapping. *See* PENAL § 20.04(a), (b); *Duran*, 492 S.W.3d 746. Here, the jury was not asked to make an express finding that Appellant used a deadly weapon, and the jury returned a general verdict. *See Duran*, 492 S.W.3d 746. Appellant's guilt was not conditioned on the use of a deadly weapon during the commission of the offense as there were other aggravating factors alleged in the indictment. *See* PENAL § 20.04(a)(4), (5); *Lafleur*, 106 S.W.3d at 95; *Roots*, 419 S.W.3d at 724. Appellant's

---

[2]The Texas Court of Criminal Appeals set out an additional circumstance where the jury makes an express finding that a deadly weapon was used or exhibited in lesser-included offenses. *Duran*, 492 S.W.3d at 747. That scenario is inapplicable to this appeal.

second issue is sustained, and we modify the judgment accordingly. *See* TEX. R. APP. P. 43.2(b); *Malbrough v. State*, 612 S.W.3d 537, 564 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (recognizing an appellate court's authority to delete a deadly weapon finding).

*Fees*

In his third issue, Appellant challenges the fees assessed against him by the trial court. In particular, Appellant argues that the $55 warrant-arrest fee should be $50 and that the $375 witness-summoning fee should be $220.

A. *Standard of Review & Applicable Law*

The Texas Code of Criminal Procedure sets out specific fees that a defendant shall be ordered to pay to reimburse the services of peace officers related to their trial. *See* CRIM. PROC. art. 102.011. For example, a defendant may be ordered to pay $50 to reimburse the execution of an arrest warrant, capias, or capias pro fine. *Id.* art. 102.011(a)(2). Moreover, a defendant shall be ordered to reimburse $5 for the summoning of a witness. *Id.* art. 102.011(a)(3). "Article 102.011 does not condition the imposition of the witness . . . fee upon which party summoned the witness." *London v. State*, 490 S.W.3d 503, 510 (Tex. Crim. App. 2016). However, "[a]n officer may not impose a cost for a service not performed." CRIM. PROC. art. 103.002.

"A challenge to the sufficiency of the evidence supporting court costs is reviewable on direct appeal in a criminal case." *Ballinger v. State*, 405 S.W.3d 346, 349 (Tex. App.—Tyler 2013, no pet.) (citing *Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011)). "We measure sufficiency by reviewing the record in the light most favorable to the award." *Ballinger*, 405 S.W.3d at 349 (citing *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010)).

If we are called to construe a statute, we focus our attention on the literal text and attempt to discern the fair, objective meaning of that text at the time of its

enactment. *Whitfield v. State*, 430 S.W.3d 405, 408 (Tex. Crim. App. 2014) (citing *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)). "This strict reading of the statutory language is necessary because 'the text of the statute *is the law* in the sense that it is the only thing actually adopted by the legislators, probably through compromise, and submitted to the Governor.'" *Id.* (quoting *Boykin*, 818 S.W.3d at 785).

B. *Analysis*

Appellant argues that he was assessed $55 for his initial arrest, as demonstrated by the bill of costs, in violation of article 102.011(a)(2). The State counters by stating: "The fee in this case reflects $50 for the execution of the arrest warrant and $5 for commitment on re-arrest." However, the bill of costs identifies the $55 as being for the *initial* arrest warrant fee. Moreover, we find no evidence in the record supporting a charge for Appellant's rearrest. Accordingly, we conclude that there is insufficient evidence to support a $55 assessment. *See* CRIM. PROC. art. 102.011(a)(2); *Cardenas*, 403 S.W.3d at 382. We modify the bill of costs and judgment to reflect "$50" for the initial arrest warrant fee. *See* TEX. R. APP. P. 43.2(b); *Ballinger*, 405 S.W.3d at 349.

Appellant next argues that the $375 assessed for summoning witnesses should only be $220 because only forty-four subpoenas were actually served. *See* CRIM. PROC. art 102.011(a)(3) (permitting $5 for "summoning a witness"). The State responds by noting that seventy-five subpoenas were issued for witnesses, but only forty-four were served. We must interpret the statute at issue, and we do so as guided by the Texas Court of Criminal Appeals in *State v. Kahookele* wherein the court instructed:

19

Statutory interpretation is a question of law, which we review de novo.

When we interpret statutes, we focus on the literal text and attempt to discern its fair, objective meaning. We give effect to the plain meaning of the statutory text, reading it in context and construing it according to the rules of grammar and common usage. We assume that every word has been used for a purpose, and we give effect to each word, phrase, clause, and sentence if reasonably possible. Generally, a statute's expression of one thing implies the exclusion of other, unexpressed things.

We look not only at the statute but also other provisions within the whole statutory scheme.

640 S.W.3d 221, 225 (Tex. Crim. App. 2021) (internal quotations marks and citations omitted).

We consider whether the statutory scheme permits reimbursements for unserved witness subpoenas. We first focus on the literal text of Article 102.011(a)(3), which provided:

> (a) A defendant convicted of a felony or a misdemeanor shall pay the following reimbursement fees for services performed in the case by a peace officer:[3]
>
> . . . .
>
> (3) $5 for *summoning* a witness.[4]

CRIM. PROC. art. 102.011(a)(3) (emphasis added).

---

[3]As alleged in the indictment, Appellant committed the offense on or about May 5, 2021. We note that the legislature amended Article 102.011(a) to, among other things, reword Subsection (a) to the following: "A defendant convicted of a felony or a misdemeanor shall pay the following reimbursement fees to defray the cost of the services provided in the case by a peace officer." *Id.* We refer to the law in effect on the date the offense was committed. *See* Act of May 26, 2021, 87th Leg., R.S., ch. 919, §§ 4, 22–23, 2021 Tex. Gen. Laws 2352, 2352–53, 2355–56 (An offense committed before September 1, 2021, the effective date of the act, "is governed by the law in effect on the date the offense was committed.").

[4]The word "summoning" is also used in Article 102.011(a)(7): "$5 for summoning a jury, if a jury is summoned." With regard to Article 102.011(a)(7), we find no reported cases on point defining "summoning" as used in that portion of the statute.

Because the Texas Code of Criminal Procedure does not define "summon" or "summoning a witness," for purposes of Article 102.011(a)(3), we give effect to the plain meaning of the term and the phrase, and we take and understand their "usual acceptation in common language." *See id.* art. 3.01; TEX. GOV'T CODE § 311.011 (West 2013). As relevant here, Black's Law Dictionary defines "summon" as "[t]o command (a person) by service of a summons to appear in court." *Summon*, BLACK'S LAW DICTIONARY (10th ed. 2014). Merriam-Webster defines "summon" as "to command by service of a summons to appear in court." *Summon*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/summon (last visited April 22, 2025). Implicit in either definition is that the individual being summoned actually received the summon or command. Stated in the inverse, a person who has not received the summon or command cannot be said to have been adequately summoned. Accordingly, we interpret the term "summoning," as used in the statute, as the act of commanding by the service of a summons. This conclusion is consistent with the text of Article 102.011. *See Whitfield*, 430 S.W.3d at 408 (statutory construction focuses on a review of the statutory text). Article 102.011(a)(3) does not provide for reimbursement for "the issuance of a subpoena," which would be completed by a clerk, but instead the "summoning of a witness" by a peace officer, indicating actual delivery. *See* CRIM PROC. art. 102.011(a)(3); *Whitfield*, 430 S.W.3d at 408. Additionally, "[a]n officer may not impose a cost for a service not performed." *See* CRIM PROC. art. 103.002. As applicable here, we conclude that in order for a defendant to be compelled to reimburse the cost of services by a peace officer, the peace officer must *serve* the subpoena. *See id.* By a strict reading of the statute's plain language, we conclude that the mere creation of a subpoena does not trigger a defendant's duty to reimburse. *See id.* art. 102.011(a)(3); *Whitfield*, 430 S.W.3d at 408.

21

Appellant argues that of all the subpoenas issued, only forty-four witnesses were duly summoned. While the State does not contest Appellant's calculation, it also does not expressly agree but notes that our sister courts have held, in unpublished cases, that a defendant cannot be charged for unserved subpoenas. *See Wilson v. State*, No. 05-22-00452-CR, 2023 WL 4758470, at *2 (Tex. App.—Dallas July 26, 2023, pet. ref'd) (mem. op., not designated for publication); *Robles v. State*, No. 01-16-00199-CR, 2018 WL 1056482, at *6 (Tex. App.—Houston [1st Dist.] Feb. 27, 2018, pet. ref'd) (mem. op., not designated for publication). Because these cases are unpublished memorandum opinions, they have no precedential value. *See* TEX. R. APP. P. 47.7(a). However, they are instructive and support our conclusion that Article 102.011(a)(3) requires that a witness actually be summoned—meaning the subpoena must be delivered or served—for a defendant to be responsible for the fee. *See Wilson*, 2023 WL 4758470, at *2; *Robles*, 2018 WL 1056482, at *6.

Forty-eight subpoenas were delivered or served in this case. "[T]he intent of the statute is to reimburse the costs borne by the peace officer." *Ramirez v. State*, 410 S.W.3d 359, 365–66 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (construing "the statute to require a $5 fee for each witness summoned each time the witness is summoned," because the legislative intent would not be fully realized "by allowing only one payment for summoning a witness regardless of the number of times that witness would have to be summoned."); *see Allen v. State*, 614 S.W.3d 736, 745 (Tex. Crim. App. 2019) ("Article 102.011(a)(3) . . . seek[s] to reimburse the expenses . . . actually incurred by peace officers in serving process on witnesses needed for the defendant's proceedings."). Thus, Appellant should have been assessed $240 for the "Summons Witness" fee. *See* CRIM PROC. art. 102.011(a)(3); *Junior v. State*, 676 S.W.3d 228, 233 (Tex. App.—Houston [14th Dist.] 2023, no pet.) (deleting the assessment where "nothing in the record demonstrat[ed] that a peace officer served a subpoena on any witness or conveyed or attached any

22

witness"), *abrogated on other grounds by Bradshaw v. State*, 707 S.W.3d 412, 415, 420 (Tex. Crim. App. 2024).

Accordingly, Appellant's third issue is sustained to the extent that it requests that we correct the witness-summons fee.

*This Court's Ruling*

We modify the bill of costs to reflect $50 for the initial arrest warrant fee and $240 for fees charged for summoning witnesses. We modify the judgment to delete the deadly weapon finding and modify the reimbursement fees to be $290. As modified, we affirm the judgment of the trial court.


W. BRUCE WILLIAMS
JUSTICE


April 24, 2025

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.